Hearing:
July 12, 2005

This Opinion is
Citable as Precedent
of the TTAB

Mailed:
August 4, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

‾‾‾‾‾

**Trademark Trial and Appeal Board**

‾‾‾‾‾

Duramax Marine, LLC
v.
R.W. Fernstrum & Company

‾‾‾‾‾

Opposition No. 91119899
to application Serial No. 75701707
filed on May 10, 1999

‾‾‾‾‾

D. Peter Hochberg of D. Peter Hochberg Co., L.P.A. for
Duramax Marine, LLC.

Marc A. Bergsman and Samuel D. Littlepage of Dickinson
Wright PLLC for R.W. Fernstrum & Company.

‾‾‾‾‾

Before Grendel, Rogers and Zervas,
Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

R.W. Fernstrum & Co. [applicant] seeks to register the
depiction shown below as a service mark in International
Class 40, for services identified as "manufacture of marine
heat exchangers to the order and specification of others"
[hereinafter may be referred to as applicant's custom
manufacturing services]. The application was filed on May
10, 1999, claiming 1975 as the date of first use of the
mark, and first use of the mark in commerce, in connection

with the services.  Applicant also alleges first use of the
mark in another form as of 1955, and that such use was in
commerce.  A description of the proposed mark states that
"the mark consists of a drawing of a marine heat exchanger."
Registration is sought under Section 2(f) of the Trademark
Act, 15 U.S.C. § 1052(f) ("Except as expressly excluded in
[other] subsections … nothing herein shall prevent the
registration of a mark used by the applicant which has
become distinctive of the applicant's goods in commerce.").



*Pleadings in the Opposition*

Duramax Marine, LLC [opposer] has filed a notice of
opposition.  Opposer asserts it "is now and has been engaged
in the manufacture and sales [sic] of external cooling
systems for marine engines" and that such systems "are
commonly called keel coolers."  Amended Opposition ¶ 1.
(Both parties have referred to marine heat exchangers as
"keel coolers"; so shall we.[1])  Opposer asserts that

---

[1] For the reader unfamiliar with keel coolers, in the image
comprising the proposed mark, the two smokestack-like vertical

2

applicant and other companies manufacture and sell keel coolers "having a flat, grid like surface formed by uniform and parallel spaced rectangular tubes"; that keel coolers so designed have been a "success"; and that, when applicant's patents covering keel cooler designs expired, opposer began copying the designs in the expired patents and engaging in "direct competition" with applicant. Opp. ¶ 2. Opposer also asserts it has become "widely known" for its marine products, including keel coolers, and has a "favorable reputation." Opp. ¶ 3.

In regard to applicant and its business, opposer asserts that applicant has been manufacturing and selling keel coolers "like that" shown by the proposed mark "for over fifty years"; that the keel cooler shown by the mark is "very similar" to the "detailed drawing of a functional" keel cooler in U.S. Patent No. 4,338,993; that applicant has used "views and drawings" of keel coolers "like that" of the

---

extensions on either end of the keel cooler are inflow and outflow connections, through which fresh water or a mix of fresh water and antifreeze flow. The water or water/coolant mixture cools the inboard engine of a boat, keeping the engine from overheating. The heat created by the engine is carried by the water or coolant mixture from the engine compartment to the keel cooler, the external surface of which is exposed to the fresh or salt water through which the boat is traveling. The heat dissipates and the cooled water or coolant mixture is then returned to the engine. The ends of the keel cooler are called headers. When installed on or in the hull of a boat, the header extensions through which water or the coolant mixture flow are inside the hull and connected to the engine by tubing. The rest of the keel cooler is outside the hull, so that it remains exposed to the body of water through which the boat travels.

proposed mark in a functional manner, for example, in installation publications; that the mark "is nearly an exact drawing" of a keel cooler applicant manufactures and sells under the mark GRIDCOOLER; and that the mark is not an arbitrary, fanciful or stylized keel cooler but "is a picture of a functional and utilitarian product… and is… equivalent to the utilitarian shape itself." Opp. ¶¶ 4-11.

Opposer also claims that the mark is "merely descriptive of the goods with which it is used"; that opposer and "at least" one other party make and market keel coolers similar to applicant's mark; that there is no distinction between applicant's keel cooler, the mark in the application, and the keel cooler of "at least one other independent manufacturer"; that if applicant obtained a registration, opposer would not be able to "show drawings or photographs" of its keel coolers; that opposer and others "displaying and demonstrating" their keel coolers or publishing "photographs or drawings" of keel coolers would "run the risk of being sued for trademark infringement" by applicant, if it obtained a registration; and, even though the keel cooler designs of applicant "are in the public domain," applicant could obtain "a perpetual monopoly in a drawing of its design." Opp. ¶¶ 12-18.

In our construction of the amended opposition, set forth above, we have read the pleading for its fair and

4

reasonable import.  For example, when opposer asserts in paragraphs 9-11, respectively, "Applicant's application Serial No. 75/701,707 does not…/is not…/is…," we have taken these as references to the mark in the application and not the application document per se.  Also, as noted in the Board's order of March 10, 2004, the Board interprets the amended notice of opposition as setting forth claims that the proposed mark is descriptive, is functional, and lacks acquired distinctiveness.[2]

Applicant, in its amended answer to the amended opposition, admitted paragraphs 1, 5, 7, 9-10 and 13 without qualification.  By the first three of these admissions, applicant has admitted that opposer manufactures and sells keel coolers, and that such keel coolers have "a flat, grid-like surface formed by uniform and parallel spaced rectangular tubes similar to those shown in" the drawing in the involved application; that the drawing of the keel cooler in the involved application is "very similar" to the drawing of a keel cooler in U.S. Patent No. 4,338,993, which "is a detailed drawing of a functional" keel cooler; and that an "article has been written about Applicant" and it included a photograph or drawing "very much like the drawing

---

[2] Whether the proposed mark has acquired distinctiveness is relevant only to the claim that the proposed mark is descriptive. Matter that is functional under Section 2(e)(5) of the Trademark Act is excluded from consideration for registration under Section 2(f) of the Trademark Act.

in" the involved application. By its admission of opposition paragraphs 9-10, applicant has admitted that its mark "does not create an overall arbitrary and fanciful impression," and "is not a stylized and fanciful illustration of" the keel coolers "with which it is used." Finally, applicant has admitted (opp. ¶ 13) that opposer and "at least one other" party "have been marketing" keel coolers "very similar to that shown in" the involved application.

By certain partial or qualified admissions of opposition paragraphs 2, 6 and 8, applicant has admitted "that Opposer copied certain functional features of Applicant's keel cooler product and that it is aware of one other company (apart from Opposer) that has recently engaged in the manufacture and sale of marine heat exchangers having a flat, grid like surface formed by uniform and parallel spaced rectangular tubes," although it denies that the design of its keel cooler "is in the public domain"; has admitted that it has used the document attached to the opposition as exhibit B; and has admitted that the drawing in the [involved] application depicts its GRIDCOOLER [keel cooler] from a particular perspective."

Applicant has either expressly or effectively denied all other allegations in the opposition. In addition, as an affirmative defense, applicant has asserted that opposer "is

estopped from now opposing or otherwise challenging the federal registration of" the involved mark, because of a "Settlement and Mutual Release Agreement."  Applicant attached a copy of the agreement to its answer, and it was separately introduced into the record.

*The Record*

The extensive record developed at trial includes, from opposer, a June 1, 2004 notice of reliance on a variety of items, and testimony depositions from eight witnesses, introducing 68 exhibits;[3] and from applicant, six notices of reliance and one testimony deposition (with exhibits).

In its notice of reliance, opposer states that it relies on: copies of two registrations owned by applicant (one for applicant's word mark GRIDCOOLER[4] and the other for a composite design mark[5] showing a globe and a drawing of a

---

[3] The total number of exhibits is smaller, as opposer has had some of the exhibits discussed by multiple witnesses.

[4] Registration No. 941,382, on the Principal Register, for "external cooling system for marine engines and installed upon the hulls of watercraft" (twice renewed).

[5] Registration No. 2,357,354, on the Principal Register, for "external cooling system for marine engines, namely, heat exchangers" (affidavits under Sections 8 and 15 filed, pending).



keel cooler that, if not the same as that in the involved application, is very similar)(Tab A of the Notice of Reliance); applicant's responses or revised responses to various discovery requests (Tabs B, C and D);[6] excerpts, including exhibits, from the discovery depositions of, respectively, Sean Fernstrum, applicant's vice president of operations, and Paul Fernstrum, applicant's president and CEO (Tab E); and certain materials presented as printed publications or official records (Tab F).  We note, however, in regard to the items submitted under Tab F, that applicant filed, and the Board granted, a motion to strike seven of the thirteen items so submitted.  As a result, the only items remaining in the record from the Tab F group of

---

[6] The materials under Tabs B and C are responses to interrogatories and requests for admissions.  The materials said to be under Tab D were reported by opposer to comprise 296 pages identified in a revised response to a certain document request and documents relating to a survey conducted by applicant and identified in response to a different document request.

  As noted in the Board's order of August 10, 2004, opposer's notice of reliance did not include the referenced 296 pages or survey documents.  As also noted in that order, a party is not permitted to introduce, by notice of reliance, documents received from an adverse party pursuant to requests for production.  TBMP Section 704.11 (2nd ed. rev. 2004).  However, because the parties' various evidentiary submissions involve some duplication, the 296 pages of produced documents on which opposer relies found their way into the record when introduced as exhibit 3 to the discovery deposition of Sean Fernstrum (Tab E of opposer's notice of reliance); and the survey documents were introduced by applicant into the opposed application file, during its prosecution, and are also present in the file contents for applicant's Registration No. 2,357,354, which was introduced into the record for this proceeding by one of applicant's notices of reliance.  We note, too, that applicant's attorney stipulated to the authenticity of the documents produced by applicant.  See p. 202 of the discovery deposition of Sean Fernstrum.

submissions are copies of five patents and the file history of an abandoned trademark application filed by applicant, Serial No. 75382250. In its brief, applicant refers to the trademark application as the "abandoned application for the configuration of the GRIDCOOLER."

The witnesses called by opposer to provide testimony are Michael W. Brakey, president of Brakey Consulting, Inc., which has opposer as one of its clients; Jeffrey Leeson, a member of opposer's engineering staff; Richard Lockhart, opposer's sales manager; George Kyle McHugh, of McHugh & Associates; Steven Garver, who identified himself as "in charge of the Commercial Division" of an entity known as Donovan Marine; David L. Culpepper, an attorney that represented Donovan Marine in a legal action also involving applicant; Todd P. Boudreaux, "owner/president" of East Park Radiator; and Paul M. Boudreaux, owner and president of Ashton Marine.

Applicant, by its notices of reliance, has introduced additional excerpts from the discovery depositions of Sean Fernstrum and Paul Fernstrum;[7] the entire file history for trademark Registration No. 2,357,354; copies of nine patents intended to "demonstrate the variety of alternative designs available for marine heat exchangers"; opposer's responses to applicant's first set of requests for admissions; and a

---

[7] See Trademark Rule 2.120(j)(4), 37 C.F.R. § 2.120(j)(4).

notice of reliance on opposer's non-response to applicant's fourth set of requests for admissions, which includes a submission of many documents applicant intended opposer to authenticate by responding to the specific requests for admission.

***Objections to Opposer's Brief, Evidence***

Applicant, in its brief, has asserted objections to Sections IV(B) and (C) of opposer's trial brief, claiming that they are mere argument unsupported by evidence and are, in any event, arguments with no relevance to the issues presented by this case. We agree that the latter of the two disputed sections, which focuses on a false advertising case between the parties, is irrelevant to the issues presented by this opposition. It has had no influence on our decision of this case. Moreover, to the extent that opposer's discussion of that civil action may have been intended to help establish the reliability of Michael Brakey as a witness in regard to issues present in this opposition, we note that our assessment of his testimony, and applicant's objections thereto, have not been influenced in any way by opposer's recounting of the false advertising action, Mr. Brakey's role therein or the disposition of that action.

In contrast, we find the section IV(B) discussion of certain consolidated trademark and trade dress civil actions relevant to this case, at least insofar as those cases

10

resulted in a settlement agreement that applicant asserts precludes opposer from pursuing this opposition. Applicant, concerned that the discussion is nothing more than an attempt to prejudice the Board against applicant, may rest assured that opposer's discussion of those cases has not led the Board to favor, or disfavor, either opposer's claims or applicant's affirmative defenses in this opposition. The claims and defenses in this case have been considered on their merits.

More specifically, it is the *settlement* of the civil actions that is placed in issue in this case by applicant's affirmative defenses, not the claims, defenses or evidence submitted in those civil actions. Because we find the settlement agreement (Brakey exh. 10; Sean Fernstrum test. dep. exh. 33) and the incorporated term sheet (Brakey exh. 9) from the civil actions clear enough to be interpreted without resort to parol evidence as to the intent of the parties that signed those items, we have had no need to resort to testimony of any witnesses, or opposer's discussion in its brief of such testimony, to discern the relevance of the settlement agreement to this case.[8] The

---

[8] Opposer's representation in section IV(B) of its brief of Michael Brakey as "an expert on keel coolers" "prepared to testify" in the consolidated civil actions has not influenced our consideration of his testimony in this opposition or of applicant's objections thereto.

11

agreement and incorporated term sheet are as relevant as their words clearly indicate.

Applicant has also asserted numerous objections to certain passages from the testimony of Michael Brakey, and to exhibits introduced during the Brakey testimony deposition.  Applicant's first objection is to certain parts of the Brakey testimony, as well as exhibit 11 (a copy of a decision on a motion for a preliminary injunction issued in a civil action), because they relate to the civil actions which applicant asserts are irrelevant, and in particular, exhibit 11 relates to the false advertising case.  We have already discussed the essence of this objection, above, in relation to arguments in opposer's brief to which applicant has objected, and need not repeat the discussion here.  We note, however, that to the extent Mr. Brakey was asked by opposer's counsel to testify to the accuracy of the contents of exhibit 11, the testimony was: "Having read this prior to today and having skimmed over it, it seems to go right along with my recollection of the trial or the hearing, I should say maybe."  "Maybe" is not definite testimony, and the indefiniteness of the testimony may be viewed as providing good reason not to accord any weight to this portion of the Brakey testimony or associated exhibit 11.  Regardless, we stress that exhibit 11 and the associated testimony have not been considered because they are irrelevant.

12

Applicant's next objection to the Brakey testimony, and related exhibits, is that he improperly testified as an expert without ever having been identified by opposer, in response to discovery requests from applicant, as an expert to be called at trial. Applicant's objection manifested itself in two different ways during the testimony deposition of Mr. Brakey. First, when Mr. Brakey was discussing applicant's involved application and a prior, abandoned trademark application filed by applicant, applicant's counsel objected on the basis that Mr. Brakey is not an expert in trademark law. Second, when Mr. Brakey was discussing structural elements of keel coolers, predominantly applicant's keel coolers, applicant's counsel objected on the basis that Mr. Brakey either was not qualified as an expert or was not identified as an expert that would be discussing keel cooler design at trial. The objection that Mr. Brakey is not a trademark expert was not maintained in applicant's brief, which only maintains an objection to "Brakey's expert testimony regarding the functionality of the GRIDCOOLER design." Thus, the first basis for objection to the Brakey testimony and exhibits was waived. The second objection, i.e., as to purported expert testimony by Mr. Brakey on opposer's claim of functionality, was maintained in applicant's brief but is largely

13

irrelevant because little, if any of the Brakey testimony or exhibits actually addresses the question of functionality.

Matter proposed for registration may be refused registration, either ex parte or through presentation of proper proof in an opposition, if the matter is shown to be "essential to the use or purpose of the product or if it affects the cost or quality of the product." See TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001); Qualitex Co. v. Jacobson Products Co., Inc., 514 U.S. 159, 165, 34 USPQ2d 1161, 1163-64 (1995); Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 850, 214 USPQ 1, 4 n.10 (1982). Thus, for the Brakey testimony or exhibits which applicant finds objectionable to be considered as testimony on functionality, expert or otherwise, the testimony would at least have to address these factors or matters of fact relevant to these factors.[9] We find that the focus of the questions, testimony and exhibits occasionally wanders near matters relevant to these factors, but never actually addresses them. Much of the transcript of Mr. Brakey's testimony is filled with arguments of counsel. See, for example, the passage from the middle of page 65, where

---

[9] We leave aside, for the moment, whether a claim of functionality brought against an application to register matter as a mark for services, rather than as a trademark for a product, would require evidence of a different type.

14

counsel for applicant interrupts the witness while he is responding to a question, through the middle of page 71, when counsel for opposer abandons any attempt to obtain a complete answer to his question and, instead, moves on to the next exhibit. Much of the transcript is also filled with requests by counsel for opposer that Mr. Brakey review and read from certain exhibits. Occasionally, the exhibits contain statements that might be considered relevant to a functionality inquiry, for example, brochures from applicant which Mr. Brakey characterizes as discussing the merits or advantages of applicant's keel coolers (p. 73), or advertisements by applicant that state, "The FERNSTRUM GRIDCOOLER® is the simplest and most dependable form of fresh water cooling available." (p. 119, witness reading from exhibit 5/AO). Mr. Brakey, however, does nothing more than read from these exhibits, which had already been entered into the record by opposer's notice of reliance, and does not actually testify about whether features shown in applicant's proposed mark are "essential to the use or purpose of" custom-manufactured keel coolers or affect the cost or quality of custom manufacturing services or the resulting products. If the testimony of Mr. Brakey has any probative value, it is limited to the question whether the design proposed for registration is a realistic or stylized depiction of an actual keel cooler. We therefore overrule

15

applicant's objection that the testimony of Mr. Brakey constitutes improper expert testimony on the question of whether the matter proposed for registration is functional.

We also overrule applicant's objection to opposer's introduction of Brakey exhibits 2-5. Exhibit 2 is the file for the involved application, which is automatically of record; exhibit 3 is the file for applicant's abandoned application for the configuration of the GRIDCOOLER, which was separately introduced by opposer's notice of reliance; exhibit 4 is a catalog from applicant that was separately introduced during the testimony of opposer's witness Richard Lockhart[10]; and exhibit 5 consists of 145 pages of various materials, of which all but one page have Bates numbers matching materials produced by applicant and separately entered into the record by opposer's notice of reliance on portions of the discovery deposition of Sean Fernstrum, and exhibits thereto.

We overrule applicant's objection to Brakey exhibit no. 7, a copy of expired U.S. Patent No. 4,338,993, issued to applicant. Mr. Brakey's testimony was as follows: "Q. Are you familiar with that patent? A. This one escapes my

---

[10] Even though the catalog is one of applicant's, applicant objected to its introduction during the Lockhart deposition on the ground that *opposer* did not produce it during discovery. This objection, if it had any merit, was not maintained in applicant's brief and so the catalog is of record. Mr. Brakey identified it as a catalog that came from a file maintained by Mr. Lockhart.

memory." (p. 127) Nor was his recollection refreshed when counsel for opposer directed his attention to a different patent, which cited to the patent in exhibit 7. (p. 128—"…I may have seen this in the past, but I don't recollect it."). Nonetheless, this particular patent was entered into the record as an exhibit to the discovery deposition of Sean Fernstrum. Thus, it is a moot point whether it also comes in as an exhibit to the Brakey testimony deposition. Of course, since Mr. Brakey was unable to testify about the patent, its value, if any, is limited to what the patent shows on its face.

### Opposer's Standing

Applicant advances two arguments why opposer should not be heard on the merits of its claims. First, applicant asserts that opposer has no standing. There is no doubt, however, that opposer and applicant are competitors; that the keel cooler depicted by the proposed mark is identical, or nearly so, to the depiction of a keel cooler in applicant's expired U.S. Patent No. 4,338,993; and that opposer has manufactured and marketed a keel cooler having the same overall appearance as that depicted in the expired patent.[11] Nonetheless, applicant essentially argues that

---

[11] Opposer, by failing to respond to a request for admission from applicant, admitted that "the mark sought to be registered" by the involved application "is not disclosed in [U.S.] Patent No. 4,338,993." "Disclosure" being a term of art in patent law, the

17

opposer has contracted away its standing, asserting that opposer agreed in a settlement agreement to limit the type of keel cooler it would manufacture and advertise. Second, applicant argues that the same settlement agreement that resulted in opposer's relinquishment of its standing also estops opposer from pursuing the opposition. Thus, while applicant's two arguments are rooted in the same agreement, i.e., the agreement settling various consolidated civil actions, the arguments are different in kind.[12]

The Trademark Act allows for the filing of an opposition to an application by any person, including a juristic person, "who believes that he would be damaged by the registration of a mark upon the principal register." 15 U.S.C. § 1063. See also, Young v. AGB Corp., 152 F.3d 1377, 47 USPQ2d 1752, 1755 (Fed. Cir. 1998). At the pleading stage, an opposer must allege facts in support of both standing and grounds for opposition. Young at 1755. "Standing is the more liberal of the two elements and [if

admission is that the patent does not disclose a particular mark proposed for registration. However, the similarities between the drawing of the invention disclosed in the patent and the drawing of a keel cooler in the involved application are unmistakable and admitted by applicant. See Opp. ¶ 5 and applicant's corresponding answer.

[12] Opposer was not a party to the agreement, but it is undisputed that a predecessor was. Consequently, we have referred to opposer as if it were a party to the agreement. While the parties dispute the effect of the agreement, there is no dispute that whatever effects it has, it binds the parties to this opposition.

not admitted or conceded] requires only [proof] that the party seeking cancellation [or opposing registration] is likely to be damaged by the registration."  Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).[13]  "A belief in likely damage can be shown by establishing a direct commercial interest."  Id.

Applicant's admission of paragraphs 1, 5 and 13, and its partial admission of paragraph 2, of the amended notice of opposition, would be sufficient to establish opposer's commercial interest in this matter.  Also, the record provides evidence that would be sufficient to prove opposer's interest even absent the admissions.  Applicant asserts, however, that it and opposer are parties to a settlement agreement; that the agreement includes terms by which opposer agreed to restrict itself to the manufacture of a keel cooler of a type different from that which was disclosed in applicant's expired patents and which applicant continues to manufacture; and that opposer also agreed that any advertising of its keel cooler would clearly depict the cooler in a way that would show it to be different from

---

[13] Young explains that the "linguistic and functional similarities between the opposition and cancellation provisions of the Lanham Act mandate" consistent construction.  Young, 47 USPQ2d at 1755. Thus, the Cunningham statement that standing is the more liberal of the two main elements a plaintiff must plead is equally applicable to oppositions.

applicant's keel cooler. Opp. Br. pp. 23-27.[14] In short, applicant asserts that opposer agreed to manufacture only a keel cooler with a beveled head, and to utilize advertising that would "clearly display the beveled end(s) of the header(s)" configured in accordance with the agreed restrictions on manufacturing. Thus, applicant concludes, opposer cannot be damaged by applicant's registration of the depiction of a keel cooler that does not have beveled headers, and opposer therefore lacks standing. We disagree.

As a competitor, opposer has an interest in seeing that any other competitor in the field of keel cooler manufacturing and sales does not register a depiction of a keel cooler that is, assertedly, descriptive. Even assuming that opposer is, by the settlement agreement, barred from manufacturing a keel cooler in the form represented by the depiction, the exclusive registration of assertedly descriptive matter by a competitor might provide that competitor with an advantage, for example, in marketing its products. Cf. Eastman Kodak Co. v. Bell & Howell Document Management Products Co., 994 F.2d 1569, 26 USPQ2d 1912 (Fed. Cir. 1993) (Board found standing in opposer even though

---

[14] The settlement agreement was introduced into the record numerous times, including through the Brakey and Culpepper testimony depositions taken by opposer and the Sean Fernstrum testimony deposition taken by applicant. The term sheet that served as the basis for the settlement agreement was introduced through the Brakey and Culpepper depositions.

proposed marks sought to be registered by applicant, and challenged by opposer as descriptive, were not in use by either party, having been applied for under intent to use. Though the Board dismissed the claim of descriptiveness by opposer, a competitor, without prejudice to later filing of a cancellation case if the proposed marks should eventually be registered, and appeal was taken from such dismissal, the standing determination was not challenged or reviewed on appeal).

In addition, the settlement agreement contemplates a possible future right of opposer to manufacture and sell keel coolers without being restricted to the type with a beveled header, i.e., it could one day manufacture and sell a keel cooler looking like that depicted in applicant's expired patent and in the proposed mark. See Settlement Agreement ¶ 11. If, however, that right did not arise until more than five years after applicant's mark were registered, and if the registration were asserted against opposer, opposer would be barred by the Lanham Act from then challenging the mark as descriptive. See 15 U.S.C. § 1064. Opposer's prospective interest in one day using the proposed mark, is a sufficient pleading of standing. Cf. <u>Windsurfing International Inc. v. AMF Inc.</u>, 828 F.2d 755, 4 USPQ2d 1052 (Fed. Cir. 1987) (The Federal Circuit distinguishes USPTO proceedings from declaratory judgment actions in the federal

district courts, explaining that those courts do not issue advisory opinions and mere interest alone by a competitor does not establish standing to initiate a declaratory judgment action).[15]

Accordingly, we find that opposer has sufficiently pleaded standing to pursue the opposition. Moreover, we find the record to contain sufficient proof of the allegations related to standing. We therefore must consider applicant's alternative argument that opposer is nonetheless estopped from pursuing the opposition by virtue of the settlement agreement.

### Equitable Estoppel

For this argument, applicant correctly observes that the settlement agreement, in paragraph 15, specifies that applicant would withdraw, with prejudice, its application "to federally register the configuration of its one-piece keel cooler product as a trademark" but that this paragraph

---

[15] In contrast, we reject opposer's argument that it might, even while bound by the agreement and while manufacturing keel coolers with beveled heads, utilize drawings or pictures of a keel cooler in marketing materials or installation manuals that would not clearly show the beveled header, that this might prompt applicant to assert a registration of the involved mark against opposer, and therefore opposer would be damaged by issuance of the registration. This argument regarding standing contemplates opposer doing, while bound by the agreement, that which it has expressly agreed to not do, i.e., utilize marketing materials which fail to show that its keel coolers have a beveled header. Opposer's standing can in no way be derived from this posited set of circumstances and is derived only from the circumstances we discuss above.

also provides that "[n]othing herein shall preclude [applicant] from seeking to register, in two dimensional design format, its trademark logo featuring its one-piece keel cooler as part of said design."

At this point, a bit more explanation is in order about the relationship of applicant's abandoned configuration mark application, the nature of the civil actions, the settlement of the civil actions, and applicant's filing of two other applications, including the involved application. Some of these subjects have been alluded to already in this decision. The explanation is derived from various materials in the record.

Applicant's prior configuration application sought registration of aspects of trade dress in the nature of product design, i.e., the application sought to register some aspects of the overall design of a particular style of keel cooler produced by applicant.[16] That particular style is illustrated by the drawing of the involved application, but in the configuration application, the unclaimed features of the overall design were displayed in broken or dotted lining. The configuration application naturally sought registration of the claimed aspects of the trade dress for actual keel coolers, not custom manufacturing of keel

---

[16] The application sought registration on the Principal Register, under Section 2(f) of the Lanham Act.

23

coolers.  Three parties, including opposer, opposed that application and the oppositions were pending when the same parties were involved in the civil actions.  Thus, when applicant agreed, in the agreement settling those actions, to withdraw with prejudice its configuration application, it resulted in the three oppositions being sustained.  The civil actions were settled by the parties first agreeing to, and signing, a term sheet.  The final signature, by opposer, was added May 10, 1999.  Later, in July 1999, a more detailed settlement agreement was signed.

Applicant filed the application involved in this opposition on May 10, 1999, i.e., on the date the final signature was added to the settlement term sheet by opposer.  A few weeks later, on May 28, 1999, applicant filed application Serial No. 75715815, for the mark shown, supra, in footnote 5.  The marks in these two applications both include what applicant asserts is a two-dimensional line drawing of a keel cooler and what opposer believes to be a very realistic and accurate depiction of one model of keel cooler produced by applicant.  The mark in the later-filed of the two applications, however, also included an image of a globe, set as a backdrop for the image of the keel cooler. Another difference between the two applications is that the involved application seeks registration of the keel cooler image for keel cooler custom-manufacturing services, while

the application with the composite globe and keel cooler design sought registration of the composite mark for keel coolers per se. The later-filed application for the composite mark was not opposed and the mark in that application has registered.

In arguing that opposer is estopped from pursuing this opposition, applicant relies not only on the paragraph of the settlement agreement reserving applicant's right to seek registration of a trademark logo, but also on paragraph 17, which is a "covenant not to sue" applicant, by two of the three parties adverse to applicant in the civil actions, specifically, Duramax and East Park Radiator & Battery Shop, Inc. That covenant releases applicant "of and from any and all damages, attorneys' fees, punitive damages, equitable and injunctive relief, costs, demands, rights, claims or causes of action of whatsoever kind, whether now known or hereafter discovered, arising in any way out of the facts and/or claims asserted (or which could have been asserted) by DMI, Fernstrum and East Park in the [civil actions] or arising in any way from the facts asserted in said [civil actions]."

As noted earlier in this opinion, opposer was not a party to the settlement agreement, but references in the agreement to Duramax, opposer's predecessor, have been taken as the equivalent of references to opposer. Thus, by

25

paragraph 17 of the settlement agreement, opposer expressly covenanted not to sue applicant and released applicant from, among other things, "claims or causes of action of whatsoever kind, whether now known or hereafter discovered, arising in any way out of the facts and/or claims asserted (or which could have been asserted)" by "DMI," which means Donovan Marine Inc., and "East Park," which means East Park Radiator & Battery Shop, Inc.  While this language does not refer to facts or claims that were asserted or which could have been asserted by opposer's predecessor in the civil actions, that is because opposer's predecessor was not a party in the civil actions and only intervened in the settlement of the actions.  Opposer does not argue that it is not bound by the agreement because it bars only claims or causes of action that were asserted or could have been asserted by DMI and East Park, and is silent as to claims that could have been asserted by opposer's predecessor. Because opposer's predecessor intervened and made itself a party to the settlement agreement, we view the covenant paragraph as covering any claims or causes of action that opposer's predecessor could have asserted in the civil actions, or could later have asserted if "arising in any way from the facts asserted" in the civil actions.

Applicant argues, in essence, that this opposition is precisely the type of claim or cause of action that opposer

26

is estopped from asserting, because it arises out of the facts that provided the basis for the claims that were asserted in the civil actions.  Estoppel is particularly warranted, according to applicant, because it specifically secured in the settlement agreement an acknowledgment of its right to file the involved application; and if applicant is held not to have obtained, through the settlement agreement, a promise that opposer would not oppose the application, then applicant "received no consideration for the abandonment of its prior [configuration] application." Brief, p. 30.  Applicant also asserts that allowing opposer to pursue the opposition would render the settlement agreement "valueless and without meaning" to applicant and would only encourage the parties to litigate their disputes, rather than to settle them.  Brief, p. 31.

There is an overriding public policy, applicant argues, that encourages settlement of litigation and requires that parties be held to the terms of their agreements.  Brief, p. 28, citing numerous cases.  The question here, however, is not what public policy promotes but, instead, what do the terms of the involved settlement mean.  In answering that question, we may not interpret the settlement agreement "on the subjective intentions of the parties" and must instead focus "on the objective words of their agreement." Novamedix Ltd. v. NDM Acquisition Corp., 166 F.3d 1177,

27

1180, 49 USPQ2d 1613, 1616 (Fed. Cir. 1999), relying on United States v. Armour & Co., 402 U.S. 673, 681-82 (1971). It is not impermissible to interpret an agreement in a way that favors one party, and where parties disagree, "an interpretation that fails to meet one party's purpose will very likely meet the other party's purpose." Novamedix, 49 USPQ2d at 1616. Armour, however, cautions that any agreement "embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve" and an agreement must therefore "be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties." 402 U.S. at 681-82.

In the agreement involved herein, the parties did not include a forum clause directing that the laws of any particular state apply. Neither party has argued for application of any particular law in interpreting the agreement. We apply the law of Louisiana. See Restatement (Second) of Conflict of Laws § 188 (1971; electronic version current through June 2005). The contract was negotiated in Louisiana, two of the four parties are domiciled there, it is the place of performance for numerous promises, and the district court there retained jurisdiction over the parties for the purpose of enforcing the agreement. We also note that the eighth "Whereas" clause of the settlement agreement

28

references the parties' agreement to the provisions in the term sheet "which each of the parties prefers to the hope of gaining balanced against the danger of losing."  This phrase is almost precisely a phrase that appears in section 3071 of Title XVII of the Civil Code of Louisiana ("A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them *prefers to the hope of gaining, balanced by the danger of losing*.") (emphasis added).  The parties' use of this phrase strongly suggests that, notwithstanding the absence of a forum clause, they anticipated that the law of Louisiana would govern the settlement agreement.

"Louisiana law provides that waivers of the right to bring future claims must be clear and are narrowly construed."  Brennan's Inc. v. Dickie Brennan & Company Inc., 376 F.3d 356, 71 USPQ2d 1400, 1408 (5th Cir. 2004)(citations omitted).  Applicant's interpretation of the settlement agreement, reached by tying paragraphs 15 and 17 together and by construing the latter too broadly, is unwarranted and contrary to Louisiana law.

We note, in particular, that applicant, in one of its requests for admissions, asked opposer to admit that "[t]he purpose of the Settlement and Mutual Release Agreement

29

executed by [the parties] was to settle the claims asserted in the three civil actions." Request no. 6. The request was admitted, and applicant introduced the response in the record. Applicant has not put into the record an admission by opposer, if any was obtained, that a purpose of the settlement agreement was to allow applicant to file applications to register marks that would be free of possible opposition. The mere fact that the agreement includes provisions relating to the USPTO, specifically, (1) applicant's agreement to abandon its configuration application and reservation of right to file a different application for a two-dimensional logo, and (2) applicant's agreement not to challenge any application opposer might later file for a two-dimensional design mark, do not dictate that settlement of prior oppositions to applicant's configuration application or ensuring that subsequent applications by applicant would be free of opposition were primary purposes for the parties to enter into the settlement agreement.

We also note that the term sheet signed by the parties, and which served as the basis for the later settlement agreement[17], includes a provision stating "Fernstrum and

---

[17] The settlement agreement acknowledges the term sheet, states that the term sheet was filed in the record for the civil actions, and states that the parties entered into the agreement to implement the transactions contemplated by the term sheet.

Duramax will release any and all claims that either party has or had against the other arising out of the *sales and manufacture of a one-piece keel cooler*." (emphasis added) It is clear that this provision in the term sheet was the basis for paragraphs 16 and 17 in the settlement agreement. Therefore, we find this to provide additional support for a narrow construction of the covenant not to sue as one related to claims arising out of trade dress concerns and issues related to use of marks, not registration of marks.

Opposer was the last of the parties to sign the term sheet, on the same day that applicant filed the application involved herein, applicant having signed the term sheet five days earlier. Thus, when applicant filed the application, it knew that the term sheet included (1) a provision providing for reciprocal releases of claims related to sales and manufacture of one-piece keel coolers and (2) specifically obligated applicant not to oppose any application opposer might later file for its keel cooler design. Knowing these facts, when the settlement agreement was negotiated, and with knowledge that its application was already on file with the USPTO, applicant was free to attempt to negotiate a provision that opposer would not oppose that application. Applicant clearly did negotiate at least one additional provision to be included in the agreement that was not in the term sheet, specifically, the

31

provision specifying that applicant would be able to apply for "its trademark logo featuring its one-piece keel cooler as part of said design."  Viewed in this context, the absence of any provision in the settlement agreement specifically barring opposer from opposing the already-filed application is telling.  See Robin v. Sun Oil Co., 548 F.2d 554, 558 (5th Cir. 1977) ("We interpret the contract to mean just what it says and no more.  Counsel in this case were competent maritime lawyers.  They knew how to use other words if they chose to do so.").

One final point that must be noted is that the involved application does not qualify under paragraph 15 of the settlement agreement.  That paragraph reserves applicant's right to seek registration of a "logo featuring its one-piece keel cooler *as part of* said design."  (emphasis added) The mark in the involved application displays only the one-piece keel cooler and is not part of a composite logo. Thus, even if applicant were correct in asserting that paragraph 17 of the settlement agreement estops opposer from opposing any application contemplated by paragraph 15, the involved application does not qualify.  Cf., Brennan's, supra, 71 USPQ2d at 1407-08 ("the fact that Brennan's permitted Dickie to engage in certain specified uses without fear of liability does not mean that Dickie is thereby immunized from trademark liability for all *unauthorized*

uses.")(emphasis in original); and <u>Chromalloy American Corp.</u> <u>v. Kenneth Gordon, Ltd.</u>, 736 F.2d 694, 222 USPQ 187, 190-91 (Fed. Cir. 1984)(settlement agreement placed certain marks which might later be adopted and used by Kenneth Gordon "outside the force of the injunction" it accepted by virtue of the agreement, but language of settlement agreement did not bar Chromalloy from asserting likelihood of confusion based on use, and merely barred Chromalloy from asserting the right to use was barred by the injunction provision).

We hold that the settlement agreement does not estop opposer from opposing the involved application. In so holding, we have not relied on any parol evidence offered by either party as to what it understood the purpose of the settlement agreement to be and, instead, have relied on the agreement and term sheet themselves.[18] Finally, we note that much of the case law on which applicant has relied for its estoppel argument either addresses only the general principle that settlement of litigation is to be encouraged, a point with which we do not disagree, or is inapposite because it involves cases in which a party was trying to remake or avoid an agreement, and we do not find opposer to be making such an attempt. Contrary to applicant's

---

[18] Applicant's request that opposer admit the purpose of the settlement agreement was to settle the civil actions supports our view of the import of the agreement, i.e., as one not intended to bar the instant opposition, but we would reach the same conclusion even without that admission in the record.

contention, opposer is not the party trying to avoid the terms of the settlement agreement.  If applicant "desires to reform or renegotiate the … agreement in accordance with its alleged interpretation, this is not the appropriate forum for doing so."  <u>Danskin, Inc. v. Dan River, Inc.</u>, 498 F.2d 1386, 182 USPQ 370 (CCPA 1974).

*Functionality*

As noted earlier, matter proposed for registration may be refused registration in an opposition proceeding if the matter is shown to be "essential to the use or purpose of the product or if it affects the cost or quality of the product."  See <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001); <u>Qualitex Co. v. Jacobson Products Co., Inc.</u>, 514 U.S. 159, 165, 34 USPQ2d 1161, 1163-64 (1995); <u>Inwood Laboratories, Inc. v. Ives Laboratories, Inc.</u>, 456 U.S. 844, 850, 214 USPQ 1, 4 n.10 (1982).  In the case at hand, we are not, however, faced with an application seeking to register matter as a mark for a product but, rather, as a mark for services, specifically, the custom manufacturing of a product for another.

Applicant relies heavily on the fact that it seeks registration of its asserted mark for services, not for goods, and stresses that it is not seeking registration of a product configuration.  Opposer, in contrast, has strenuously argued that applicant's custom manufacturing

34

services are such in name only, and that the keel coolers it manufactures, or at least that type of keel cooler which is ably illustrated by the proposed mark, is essentially a single product that merely is adapted in, for example, width or length, to fit a particular boat. To be sure, the record is unclear as to what percentage of the keel coolers sold by applicant is attributable to purchase of "stock" items and what percentage is attributable to custom manufacturing. Compare the testimony of Sean Fernstrum with applicant's web site:

> Q. Does Fernstrum keep keel coolers or marine heat exchangers in inventory?
> A. Considering our -- our wide range of models, we keep a -- a relatively small number of coolers in stock; more-common models that would be needed say, in emergency situations. So, no, we don't keep a great number in stock. We're a job shop. We -- build to the order and specification of our customers.
> Test. Dep. Sean Fernstrum, pp.8-9

> "Because approximately 30% of all units we manufacture are custom designs, we can easily tailor a unit to your specific application." Applicant's web site, submitted as Fernstrum exh. 20 [Bates page no. 000114]

Notwithstanding that there may be a difference of opinion between the parties, and lack of certainty in the record, regarding what percentage of applicant's keel coolers is custom manufactured,[19] it is abundantly clear

---

[19] In the discovery deposition of Sean Fernstrum, generally at pages 106-126, the witness attempts to explain the apparent

35

that applicant does offer custom manufacturing services and that it touts the adaptability of its designs and manufacturing as contributing to the asserted superiority of its products. There is no requirement that a party seeking registration of a mark for custom manufacturing services only produce custom manufactured goods, or even that a particular percentage of its goods be custom manufactured. Thus, though opposer would have us ignore the identification of services in applicant's application, and essentially treat it as an application to register a trademark for goods rather than a service mark for services, we find no basis for doing so.

Another point on which the parties have a difference of opinion relates to the proposed mark itself. Opposer essentially asserts that the image of the keel cooler is so realistic as to be the equivalent of a photograph, or perhaps a technically precise drawing ("It is either a line drawing made from a photograph … or an exact drawing." … "There is nothing ornamental, fanciful or arbitrary in the drawing….") Brief, p. 18.[20] Applicant, on the other hand,

---

discrepancy between applicant's web site and his statements, in contrast, that 80 to 90 percent of applicant's keel coolers are "built to order by custom design" and "stock units" are "fairly insignificant." We find the explanation difficult to follow. Nonetheless, as discussed above, it is not necessary to this decision to determine precisely what percentage of applicant's keel coolers results from its custom manufacturing services.

[20] While opposer has pleaded distinct, alternative claims that the proposed mark is functional or descriptive and devoid of acquired

argues that the proposed mark "is a partial representation of but one of many different [keel cooler] designs" used by applicant and "is *not* a three-dimensional representation of the product, it is *not* drawn to scale, and it is *not* used in technical drawings of the product." (emphasis in original) Brief, p. 1.

Applicant makes too much of what the mark assertedly is not; and it is worth distinguishing here between the mark drawing, as an element of the application, and the mark itself. No drawing of a trademark that is the subject of an application for registration is presented in true three-dimensional form. Even an application to register a configuration of a product depicts a mark in two-dimensional form, perhaps from a view that yields a perspective of depth, as in applicant's abandoned configuration application. The fact that a drawing of a mark is in two dimensions will not preclude the mark from being refused as functional. See In re Deister Concentrator Co., Inc., 289 F.2d 496, 129 USPQ 314 (CCPA 1961) (Mark described as a "substantially rhomboidal outline" "applied to the goods" by fashioning the ore concentrating and coal cleaning table in such shape refused registration as functional; depiction of mark in two dimensions by four lines forming a rhomboid);

---

distinctiveness, both claims rely on opposer's contentions regarding the nature of the depiction of applicant's keel cooler.

and <u>In re North American Phillips Corporation</u>, 217 USPQ 926 (TTAB 1983) (Mark described as a "triangularly shaped plate having smoothly rounded corners and having three circular openings therein" and which was a configuration of the face plate of an electric razor refused registration as functional; depiction of mark in two dimensions, as if viewed directly from the front, with no perspective of depth).

As for applicant's contention that the mark is not drawn to scale, the record does not reveal exactly how this contention can be tested. Moreover, if we are to take as correct applicant's contention that each keel cooler is essentially created specifically for a particular boat and application, then few keel coolers would be alike and any illustrative drawing of a keel cooler would almost assuredly be out of scale to most of applicant's keel coolers. Nonetheless, we note that applicant used almost precisely the same drawing, but for the presentation of some matter in dotted lines, in its application seeking to register the configuration of its keel cooler as a mark. If the drawing was sufficiently close in scale to an actual keel cooler, so that it could serve as a drawing in a configuration application, it cannot now be seriously contended that the drawing is significantly out of scale. See, in this regard, the discovery deposition of Paul Fernstrum, at pages 76-77:

"Q. (By Mr. Hochberg) In other words, they're nearly identical; is that correct? A. Yeah." See also, the cross-examination of Sean Fernstrum, during his testimony deposition, at pages 122-123: "Q. Okay. Let's go to exhibit 25. Now, the--there's a picture of a keel cooler shown in the upper center of the page. That's what you contend is-- is an example of your logo. A. Yes. … Q. And this is pretty much the way a real keel cooler would look, isn't it? A. Yes."

Finally, as for applicant's contention that the mark drawing is not used as a technical drawing in items such as installation manuals, we find no significant distinctions between the characteristics of the drawings used in installation instructions, as illustrated by the exhibit reproduced on page 35 of applicant's brief, and the drawing of the mark in the application. In fact, exhibit no. 17 to the testimony deposition of Sean Fernstrum, a GRIDCOOLER catalog, shows the full panoply of images of keel coolers that applicant uses in marketing materials. There are, in that catalog, the keel cooler and globe design, the keel cooler design sought to be registered by the involved application, illustrations of "common installations" for applicant's GRIDCOOLER that are remarkably similar to the depictions on page 35 of applicant's brief, and other images and photographs. We see little, if any, difference between

the degree of stylization of the depiction of the involved mark in the catalog and the depictions of keel coolers in common installations.

In short, despite all the things that applicant says its mark drawing is not, it is the admitted equivalent of the drawing of a keel cooler configuration applicant earlier sought to register (albeit without the dotted or broken lining utilized in that application), and "is pretty much the way a real keel cooler would look," and we find the drawing to be essentially the same as the drawing in applicant's expired U.S. Patent No. 4,338,993 (albeit viewed from a different angle). Thus, there is nothing about the depiction of the keel cooler in the involved application that is so highly stylized or unlike an actual keel cooler that would preclude a finding of functionality on that basis alone.

We do agree with applicant, however, that there is a significant difference between an application to register trade dress in the nature of product design as a mark for the product itself (e.g., applicant's abandoned configuration application) and an application to register a two-dimensional drawing that may look very much like such a product, but is used on labels, catalogs, brochures, and in various other ways as a mark for services. The inquiry regarding functionality may need to be decidedly different

40

in the latter set of circumstances and this opposition is therefore a case of first impression for the Board.

The vast majority of the functionality cases deal with product design or product packaging. Indeed, applicant contends that opposer has not cited in its brief "a single case where a two-dimensional mark used in connection with services has been held functional." Brief, p. 2. Opposer does not directly rebut the argument in its reply brief, and that may be because there is no reported case law dealing with such a combination, i.e., a case involving a two-dimensional mark, not trade dress, and involving services, wherein the mark was held not a mark but, rather, functional. Cf. Fotomat Corp. v. Photo Drive-Thru, Inc., 425 F.Supp. 693, 193 USPQ 342 (D.N.J. 1977) (hereafter, Fotomat NJ). In the Fotomat NJ case, the district court, on plaintiff's motion for a preliminary injunction enjoining defendant from use of a logo and trade dress of a drive-through kiosk providing various retail and photofinishing services, found that defendant had not rebutted the presumptive validity of plaintiff's registered logo, and granted the injunction as to defendant's logo, but the court also found that the plaintiff's kiosk trade dress was primarily functional and therefore denied the preliminary injunction as to defendant's use of its own kiosk. There are other cases brought by the Fotomat Corporation wherein

41

its kiosk trade dress was found protectible rather than functional. See Fotomat Corp. v. Ace Corporation, 1980 U.S. Dist. LEXIS 16114, 208 USPQ 92 (S.D. Cal. 1980) and Fotomat Corp. v. Steven Cochran, d/b/a Quick Stop Photo, 437 F.Supp. 1231, 194 USPQ 128 (D. Kan. 1977). The significance of these three cases, however, is not whether the kiosk trade dress was or was not held to be functional for services, but that even in the one case where the kiosk trade dress was held functional, a fairly accurate depiction of the kiosk, registered as a logo, was not held functional. It is also noteworthy that, in that particular case, the defendant did not even challenge the logo as functional. Fotomat NJ, 193 USPQ at 353 ("The defendants have offered no evidence which rebuts the statutory presumption … that Fotomat's service mark was validly registered … and that Fotomat has exclusive right to use the mark in commerce….").

We recognize that the instant case is significantly different from the Fotomat cases, and from similar cases involving trade dress in the nature of building design (interior or exterior) claimed to be a mark for services. Specifically, in the case at hand, the services are not restaurant services or retail sales of photographic products, but are custom manufacturing of a specific type of item, once-patented, for which the patent has expired. Applicant's competitors or would-be competitors, save for

the voluntary restriction opposer took on itself via the settlement agreement, are free to manufacture the once-patented item; and even are free to manufacture the item in varying sizes, to the order and specification of customers. Thus, the case at hand presents, more than cases involving restaurant or retail kiosk trade dress, a much closer question regarding whether any manufacturer of the formerly patented item should be free to utilize, in advertising its goods for sale, a realistic depiction of the item.

Opposer has advanced some compelling arguments why applicant should not be permitted to register what is in essence the two-dimensional depiction of the formerly patented product that appeared in the patent itself, even for services. Nonetheless, we must balance against opposer's argument for the extension of existing case law on functionality what is shown by the record to be long use of the keel cooler depiction by applicant in the manner of a logo. Further, opposer has not discussed whether, when custom manufacturing services are involved, we should still apply the TrafFix test for functionality (a three-dimensional product design is functional if it is "essential to the use or purpose of the product or if it affects the cost or quality of the product") to the product that results from purchasing the services, or whether the test should be

43

adapted and focus on whether use of the two-dimensional design to be registered is essential to anyone who would provide the same service, or would, if unavailable, affect the cost or quality of the service.

Opposer has failed to persuade us that an extension of existing law to cover the circumstances of this case is warranted. We decline to sustain the opposition on opposer's claim of functionality. We add, however, that our decision does not foreclose the extension of TrafFix to service marks if circumstances in a future case warrant such an extension.

### *Descriptiveness and Acquired Distinctiveness*

We now turn to opposer's second claim. Opposer essentially contends that the depiction of a keel cooler that applicant seeks to register is descriptive and that it has not acquired distinctiveness. "Where, as here, an applicant seeks a registration based on acquired distinctiveness under Section 2(f), the *statute* accepts a lack of distinctiveness as an established fact." Yamaha International Corp. v. Hoshino Gakki Co., 840 F.2d 1571, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) (emphasis in original). This means that opposer is not required to advance evidence

of descriptiveness and may concentrate its case on the question of acquired distinctiveness.[21]

As Yamaha explains, when matter proposed for registration under Section 2(f) is approved by the USPTO for publication, there is a presumption that the examiner found a prima facie case of acquired distinctiveness by the applicant for registration. Id., 6 USPQ2d at 1004. In an opposition, "the opposer has the initial burden to establish prima facie that the applicant did not satisfy the acquired distinctiveness requirement of Section 2(f)." Id., 6 USPQ2d at 1005. "If the opposer does present its prima facie case challenging the sufficiency of applicant's proof of acquired distinctiveness, the applicant may then find it necessary to present additional evidence and argument to rebut or overcome the opposer's showing…." Id.

The case at hand having been completely tried, "the only relevant issue … is which party should prevail on the entire record" regarding acquired distinctiveness, and it is therefore unnecessary to discuss the shifting of burdens or whether prima facie cases have been made out by either

---

[21] Notwithstanding that an opposer challenging an application seeking registration under Section 2(f) need not prove descriptiveness or lack of inherent distinctiveness, the kind and amount of evidence of acquired distinctiveness required to secure a registration will necessarily vary with the subject matter for which registration is sought, Yamaha, 6 USPQ2d at 1008, and an opposer's submission of evidence that matter is highly descriptive therefore may benefit its attempt to ratchet up the kind and quantity of evidence of acquired distinctiveness required in a particular case.

party.  Id., 6 USPQ2d at 1006.  However, under this analysis, the "ultimate burden of persuasion" is on the applicant.  Id.  Finally, the standard for applicant to meet is preponderance of the evidence, "although logically that standard becomes more difficult to meet as the mark's descriptiveness increases."  Id., 6 USPQ2d at 1008.

In securing the examining attorney's approval of the involved mark for publication, applicant based its claim of acquired distinctiveness solely on a survey.  Applicant did not, however, directly introduce the survey into evidence in the opposition; and though opposer referenced it in a notice of reliance, opposer essentially assumed that, because the survey was filed in the application, and the application is automatically part of the record in this opposition, opposer did not have to attach the survey documents to its notice of reliance and mere reference to them was sufficient.  Neither the submission of the survey to the examining attorney nor opposer's mere reference to it in a notice of reliance makes it a part of the record.  See British Seagull Ltd. v. Brunswick Corp., 28 USPQ2d 1197, 1200 (TTAB 1993), aff'd, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994), cert. denied, 514 U.S. 1050 (1995).

Applicant did file a notice of reliance on the contents of the file for its Registration No. 2,357,354 and, more specifically, on a response to an office action by which

46

applicant set forth a claim of acquired distinctiveness of the composite globe and keel cooler mark (see footnote 5, supra). The survey documents were included with that response. By the terms of the notice of reliance, however, applicant stated not that it was relying on the registration file contents to support its claim of acquired distinctiveness but, rather, to establish that opposer and others in the marine industry, not having objected to that application, "did not find that the registration of that mark would bestow upon applicant a right of ownership in that drawing of the keel cooler to which it was not otherwise entitled." Applicant's First Notice of Reliance Under Trademark Rule 2.122(e) (July 30, 2004). Further, applicant did not, in its brief, present any argument on acquired distinctiveness that relied in any way on the survey. Accordingly, to the extent that applicant might have had a right to rely on the notice of reliance not as evidence of what opposer and others purportedly believed about the composite globe and keel cooler mark, but also as evidence of the acquired distinctiveness of the involved mark, applicant has waived any such right by not addressing this evidence in any way in the arguments in its brief on acquired distinctiveness. Accordingly, we have given no consideration to the survey.[22]

---

[22] Had applicant argued for the survey as evidence of acquired

47

"In most oppositions to registrations under Section 2(f), prevailing opposers have presented some evidence that the mark has not acquired distinctiveness, such as others' use of the proposed mark or similar marks." <u>Yamaha</u>, 6 USPQ2d at 1008-07. In this case, opposer's evidence of use of the proposed mark, or similar marks, as evidence that applicant's proposed mark has not acquired distinctiveness, is extremely limited. There is testimony that has been offered to the effect that the proposed mark could be seen as a depiction of a keel cooler of various parties. See, e.g., trial testimony depositions of George McHugh, pages 10-12 ("Could be East Park, could be Duramax, Fernstrum, could be any one of the three of them."); of Steven Garver, pages 7-9, who testified that no one from applicant ever told him the proposed mark was a Fernstrum trademark and the depiction of a keel cooler could just as readily be a depiction of a DuraCooler or an East Park keel cooler; and of Todd P. Boudreaux, who discussed East Park's use of the depiction in some ads, as well as applicant's demand that East Park cease using the depiction. Also, exhibits 30 and 32 to the testimony deposition of Sean Fernstrum show use of

---

distinctiveness, we would have rejected the argument. The survey tested for recognition only of tubing used in applicant's keel coolers, and did not test for recognition of either entire keel coolers or the involved illustration of a keel cooler.

48

depictions of opposer's DuraCooler in, respectively, an advertisement and in an installation manual.

The testimony of various witnesses for opposer that the Fernstrum depiction could be perceived as a depiction of the keel coolers of others because, for a time, Fernstrum was not the only manufacturer of a grid-like keel cooler with rectangular headers, is not testimony that others used the Fernstrum depiction. There is, in fact, no evidence of use of the proposed mark by others, apart from the evidence regarding use by East Park of what was asserted by applicant to be the Fernstrum keel cooler logo mark. The dearth of evidence of use of the proposed mark, however, is not surprising because, for a long time, the protection of the patent laws secured to applicant alone the right to produce a keel cooler looking like that illustrated by the proposed mark.[23] As for evidence of use of a similar keel cooler depiction, there is only the referenced evidence showing use by opposer of depictions of the DuraCooler design.[24]

---

[23] In addition, though not clearly established by the record, applicant suggests that the industry may be rather limited, referencing only three other companies "actively manufacturing and selling keel coolers," and that two of those only entered the market during the period of time applicant has been using its design. Brief, p. 38.

[24] We note that Yamaha discusses the value of evidence of use of the proposed mark "or similar marks." In stating that we view the use of the DuraCooler depictions to be "similar" to applicant's proposed mark, we do not use that term in the sense that we would if we were discussing likelihood of confusion, and we are, at this point, unconcerned with whether prospective purchasers of a keel cooler or custom manufactured keel cooler

Applicant argues that the acquired distinctiveness of its keel cooler design is demonstrated by the following evidence: (1) use of the design on a substantially exclusive and continuous basis since 1975; (2) during this period of use, applicant has promoted its logo in marine industry trade journals, at marine industry trade shows, and during personal sales visits; (3) average annual expenditure of approximately $120,000 on print and trade show advertising during the five years prior to Sean Fernstrum's testimony deposition; (4) personal sales calls by applicant's employees or by manufacturer's representatives or distributors, during which literature and promotional materials featuring the keel cooler design are distributed; (5) that an estimated 90 percent of the relevant marine industry has been exposed to the logo and an estimated 75 percent of companies in the industry have actually purchased one of applicant's keel coolers; (6) that East Park Radiator and Battery Company, a competitor, intentionally copied the design and used it in ads, but stopped when confronted by applicant; and (7) that applicant has already registered,

---

could tell them apart. Rather, the issue is whether the proposed mark or depictions similar in kind are used in the field, because that is to be considered in the calculus of how highly descriptive the images are for consumers and, as a result, how much evidence of acquired distinctiveness is necessary to find applicant's proposed mark registrable.

under Section 2(f), its composite globe and keel cooler logo (see supra, footnote 5).  Brief, pp. 40-44.[25]

The record clearly supports applicant's claim to substantially exclusive and continuous use and its claim that the design, or at least variations of it, have been widely reproduced in sales and promotional materials, in advertisements, and on promotional items.  However, as between mere use of the design and actual promotion of the design, the record is mixed.  Sean Fernstrum testified that during personal sales calls, the attention of customers is drawn to the appearance of the GRIDCOOLER, particularly the rectangular heads ("A rectangular head means it's a

---

[25] Applicant obtained effective admissions from opposer that opposer "intends to use the design of its keel cooler" as a trademark and service mark.  Applicant's Second Notice of Reliance Under Trademark Rule 2.120(j), requests no. 128 and no. 129.  However, applicant did not rely on these as support for an argument that depictions of keel coolers can function as marks. Moreover, opposer's DuraCooler ad and installation manual both utilize TM designations with the word DuraCooler, but make no claim that the depiction of the keel cooler is a mark.  See exhs. 30 and 32 to test. dep. of Sean Fernstrum.

Because opposer's admissions were technical and obtained when opposer failed to respond to applicant's requests for admissions, and because evidence of opposer's advertising of its keel coolers does not corroborate the essence of the admissions, we do not find the technical admissions to favor either party on the question of acquired distinctiveness.  Accordingly, under the circumstances of this case, we do not consider the admissions to provide significant support for the proposition that depictions similar to the proposed mark are used by others (which would support opposer's position) or to support the proposition that such depictions are routinely perceived in the industry as marks (which would support applicant's position).  Cf. Yamaha, 6 USPQ2d at 1009 (Board had broad discretion in its weighing of testimony from experts that guitar head designs other than that sought to be registered by the applicant in that case could serve as source indicators).

Fernstrum Gridcooler keel cooler. Nobody else uses that rectangular head."). Test. dep. at pp. 19-20. Later, he testified that outside sales representatives are instructed to promote the grid-like appearance as well as the rectangular heads. Test. dep. at 61. On cross-exam, the witness testified that instructions to sales representatives on this subject are only provided verbally. Test. Dep. at 112. Applicant's ads do not show the same focus. In an ad placed in 2003 in the directory for the International Workboat Show, applicant references "a confusing world of look-alikes" and references its "one-piece header construction" without referencing such headers as being rectangular. Sean Fernstrum exh. 22. And a January 2000 ad in Workboat magazine includes the tag line "Look For The Grid… Find Fernstrum Quality," and does not mention headers. Sean Fernstrum Exh. 23. There is little if any other evidence approximating the type that could be said to condition customers to look for a particular feature.

While the image of applicant's keel cooler is widely used, there is little evidence of "look for" advertising or actual promotion of the logo. In addition, the various ads, catalogs, brochures and promotional materials do not display the design in a uniform manner. In some, the foreground of the image is on the right and it runs back to the left, while in others the image is reversed and the foreground,

like the drawing in the involved application, is on the left, running back to the right. In some depictions, the design is superimposed over a globe, but the globe design is not always the same. The design may be a line drawing, or it may have large dark areas, so that the contrast between elements often differs. In short the display of the design is not consistent and there is little evidence customers are educated to look for any particular design. In addition, there is the testimony of Steven Garver, who testified that he has sold keel coolers from both opposer and applicant but was never told by anyone from applicant that the image of its keel cooler was a trademark.

Another difficulty we have weighing the Sean Fernstrum testimony and exhibits is that the extent of distribution of promotional items, brochures and the like is uncertain. Sean Fernstrum used one word – "thousands" – to indicate how many of various exhibits were produced or distributed. This response was given for exhibits 4, 6, 7, 9, 12, 13, 14, 15, 21, 24, 25, 26, and 29. There were said to be "hundreds" of a banker's bag distributed, and "over 10,000" of exhibits 16, 17 and 18. We simply do not find the testimony very compelling, for it appears that the numbers are mere vague estimates.

Next, we consider applicant's promotional expenditures. Opposer, in cross-examining Sean Fernstrum, sought

53

information on the size of applicant's business, so as to compare the amount spent on promotion with sales realized. Applicant refused to provide the information. Thus, while we have testimony about promotional expenses, we do not have information about sales. On the other hand, we conclude that sales have not been insignificant, insofar as the testimony of the witness that 75 percent of companies in the industry have "on and off" made purchases from applicant. Likewise, we do not find the annual amount spent on advertising and promotion insignificant, although we do not find it particularly substantial for a company that does national advertising and promotion, attends trade shows, distributes promotional items and maintains a web site.

We note at this juncture in our consideration of applicant's asserted evidence of acquired distinctiveness, that it would be virtually impossible to sort out the advertisements, catalogs and other publications, or to break down the promotional expenses, all discussed above, into evidence that supports applicant's sales of goods and evidence that supports its marketing of custom manufacturing services. Certainly, not all the ads or promotional expenses support a claim of acquired distinctiveness of the involved design for custom manufacturing services. We have not, however, attempted to divine which individual items of evidence, or what portion of promotional expenses do support

54

the claim, because we find that even if all the evidence were considered to provide proper support for the claim of acquired distinctiveness for the design and services in the involved application, it would be insufficient evidence.

Turning back to other asserted evidence of acquired distinctiveness, applicant contends that even opposer's witnesses recognize the involved design. In particular, applicant relies on numerous passages from the testimony deposition of Michael Brakey. However, the passages noted by applicant are not as supportive of applicant's contention as it would have us believe. The discussions on page 79 involve the Fernstrum composite globe and keel cooler design. It does not follow from the characterization of the witness that the composite is well known that the design of a keel cooler alone would be well known as indicating applicant. Likewise, the testimony of the witness on pages 96, 97 and 101 is more accurately characterized as testimony that the photocopies of the ads are of poor quality and that, relative to the difficult to see images of boats, the image of applicant's keel cooler is of good quality. This can scarcely be considered testimony that the image of the keel cooler is a widely known mark; and the mere fact that the witness refers to "the Fernstrum keel cooler" in discussing the images in the ads does not necessarily indicate that the design is perceived as a mark, for each of

the ads includes the Fernstrum name. Applicant also relies on passages from the testimony of Todd Boudreaux and Paul Boudreaux, but the referenced passages do not discuss the proposed mark and are more properly read as statements that applicant's keel cooler is a product well known in the industry.

Building on its assertion that Todd Boudreaux viewed the GRIDCOOLER logo, as opposed to the product itself, as well known in the trade, applicant also asserts that when East Park Radiator and Battery Company used the Fernstrum image in advertising, it amounted to intentional copying. Such copying, applicant correctly asserts, can be significant evidence of secondary meaning. We do not view the record, however, as providing strong support for applicant's allegation of intentional copying of a well known logo. First, the testimony of the witness was not that the logo was well known, but that the product was well known. Second, it is undisputed that East Park Radiator and Battery Company was at one time repairing applicant's products. It is just as likely, on this record, that East Park's use of the Fernstrum image in an advertisement was innocent and without knowledge that Fernstrum claimed rights in the image alone, rather than intentional. There is no evidence of record that East Park, even after it began manufacturing a keel cooler that looked the same as

applicant's, did so in an effort to pass off such product as a Fernstrum product.

The final piece of evidence of acquired distinctiveness that we consider is applicant's reliance on its prior registration of the composite globe and keel cooler design, itself registered under Section 2(f). Applicant relies on Trademark Rule 2.41(b), 37 C.F.R. § 2.41(b), but that rule allows that a prior registration of "the same mark" may be accepted as evidence of acquired distinctiveness. What constitutes "the same mark" is rather strictly construed. See Section 1212.04(b) of the Trademark Manual of Examining Procedure (4th ed., April 2005). We do not find applicant's composite globe and keel cooler design mark to constitute the same mark as that which it now seeks to register. We also note that the only evidence of acquired distinctiveness provided to the examining attorney to secure registration of the composite mark was the survey already referenced herein.[26] We have previously discussed this survey as an item on which applicant placed no reliance whatsoever in its brief, essentially waiving any claim to it as evidence of acquired distinctiveness. Applicant cannot rely on the survey indirectly by relying on a registration that issued

---

[26] The examining attorney had required applicant to disclaim the image of the keel cooler on the ground that it is descriptive. Applicant then amended the earlier application to assert acquired distinctiveness.

when an examining attorney accepted the survey.  The Board is not bound in this case to accept the survey simply because the examining attorney accepted it in a prior application.  Moreover, as we have noted, supra, in footnote 22, had applicant argued that the survey was significant evidence of acquired distinctiveness, we would have rejected the argument.

Weighing all the evidence in the record on acquired distinctiveness, and because we find the depiction of the keel cooler proposed for registration to be highly descriptive, we do not find sufficient evidence to support applicant's claim of acquired distinctiveness.

### *Decision*

Applicant's affirmative defenses that opposer does not have standing and is equitably estopped from bringing this opposition are denied.  The opposition is dismissed as to opposer's claim that the proposed mark is functional for applicant's identified services.  The opposition is sustained as to opposer's claim that the proposed mark is descriptive and has not been shown to have acquired distinctiveness.